IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 1, 2011

**STATE OF TENNESSEE v. JAWASKII WILLIAMS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-03499      Chris Craft, Judge**

**No. W2010-00706-CCA-R3-CD  - Filed June 21, 2011**

The defendant, Jawaskii Williams, was convicted of second degree murder, a Class A felony, and aggravated assault, a Class C felony, by a Shelby County Criminal Court jury. He was sentenced to twenty-one years for the murder conviction and five years for the aggravated assault conviction, to be served concurrently in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and the sentences imposed by the trial court.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, District Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and Dianne Thackery, Assistant Public Defender (at trial), for the appellant, Jawaskii Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; Marianne Bell and Chris West, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the defendant's shooting into a vehicle occupied by Raymond Carruthers and Avery Diggs after Carruthers refused to leave a party at the defendant's home.  Carruthers was killed as a result of the shooting and Diggs was grazed by a bullet.

Thereafter, the defendant was charged with the second degree murder of Carruthers and the aggravated assault of Diggs.[1]

Mary Moore, the victim's aunt, identified photographs of the victim and stated that he died on January 5, 2008, when he was twenty-three years old.

Avery Diggs, the victim of the aggravated assault, testified that he and the victim worked together at an IHOP restaurant in Millington in early 2008. The victim's girlfriend at the time was one of their coworkers, Kierra Barnett. On January 5, 2008, Diggs and the victim left the victim's apartment to go to another coworker, Elisha Dowell's, house "for a party that [the victim] said that [they] were supposed to go to." However, they did not know where Dowell lived, so they drove around the general area looking for her residence. As they were driving around, they saw Trishanna Thomas, the victim's cousin's girlfriend, at a gas station and stopped to ask her where Dowell lived.

Diggs recalled that at the gas station, Thomas was with a "light-skinned dude," Kierra Barnett, and Barnett's sister. The victim went to the silver truck that they were in and called for Barnett "to get out of the truck" and tried to open the door. Apparently, Barnett had told the victim earlier that evening that she did not want to go on a date with him and, instead, wanted "to go with [Thomas] and whoever else she was with." The victim was angry, but he was not screaming at Barnett or threatening her. However, Barnett refused to get out of the truck.

Diggs testified that the victim got back into his car, and they followed the truck to the location of the party. The victim parked his car on the street in front of the house, immediately behind the silver truck. Diggs noted that Dowell lived at the house along with the defendant, whom Dowell referred to as her husband. Once parked, the victim got out of his car and approached the truck, urging Barnett to get out. However, the victim "wasn't pulling on the truck this time," and he never physically threatened Barnett.

Diggs testified that Barnett did not get out of the truck. Others, including Diggs, Barnett's oldest sister, Dowell, and Thomas, were standing around the truck during the exchange between the victim and Barnett. Dowell told Diggs and the victim that they needed to leave, and then Diggs "heard the gunshot in the air like pow" coming from near the house. The gunman exclaimed, "[Y]'all need to get the fuck up out of my yard," and Diggs made his way toward the victim to encourage him to leave. At no point during the incident did Diggs or the victim say anything to the gunman.

---

[1] Although there are two victims in this case, we will refer to Carruthers as "the victim" and to Diggs by his last name.

-2-

Diggs got into the victim's car and "a minute, minute and a half" later, the victim started to get into his car, paused midway for about ten seconds, then finished getting into the car, and closed the door. Out of his peripheral vision, Diggs saw a figure holding something come near the car and then heard a gunshot. Diggs recalled the sound of glass breaking and could tell that something hit his left hand, so he "played dead." He next heard "somebody come up to the window and was like, damn, they fucked up."

After playing dead for three to five minutes, Diggs prepared to drive away, but he saw the police arrive and got out of the car. Diggs walked to the back of the victim's car and punched out the back window because he was upset. Diggs stated that at no time prior to the shooting, did he or the victim reach down into the car for anything, and neither of them had a weapon that night.

On cross-examination, Diggs testified that Dowell had invited them to her party "because she was talking about it at work to everybody at work, telling us that she was having a party at her house." Diggs recalled that when they were at the store, Thomas told them to follow their truck to the party. Diggs stated that after the shooting and the arrival of the police, Dowell was the only person remaining at the scene whom he recognized.

Trishanna Thomas testified that she worked at IHOP in January 2008, along with the victim, Diggs, Dowell, and Barnett. She was aware that Barnett was dating the victim at the time. On January 5, there was going to be a birthday party at the house Dowell shared with the defendant. That evening, Thomas drove Dowell and Barnett to Dowell's house in her PT Cruiser. At some point during the evening, Thomas, Barnett, Barnett's sister, Jessica,[2] and a dark-skinned friend of the defendant left the party in a black truck "to get some more drinks." Thomas recalled that the victim had called her and Barnett that evening.

Thomas testified that the three girls went into the store and then returned to the truck to leave. By that time, however, the victim and Diggs had arrived, and the victim approached the truck and told her and Barnett to get out, but they refused. The dark-skinned friend of the defendant told the victim and Diggs to get back in their car and follow them to the party. When they arrived at the house, they parked the truck on the street and the victim parked behind them. The victim and Diggs got out of their car, and Jessica and the defendant's friend got out of the truck. However, Barnett and Thomas remained in the truck. The victim and Jessica started arguing, and the victim tried to urge Barnett to get out of the truck. However, the victim never approached the truck.

---

[2] Some people will be referred to by first name only because his or her last name is not clear in the record. We mean no disrespect by this practice.

Thomas testified that she and Barnett sat in the truck for fifteen to twenty minutes before she got out of the truck and stood nearby watching the victim and Jessica argue. Thomas and Dowell tried to get the victim to leave, while Barnett remained in the truck. Thomas said that the defendant later came out of the house with a long gun in his hand, which he used to shoot in the air one time. The defendant did not say anything when he fired the gun. Thomas did not see the victim or Diggs grab anyone. Thomas then went inside the house for a moment and, when she returned outside, saw "the confrontation with the gun." Thomas elaborated, "It was [the defendant] and his friend rambling with the gun so [she was] not sure exactly which one shot or anything else because after that [she] was in the house again." Once she got inside the house, Thomas heard two gunshots and screaming and then Dowell came into the house with a gun.

On cross-examination, Thomas testified that she, Barnett, and Jessica left the house after the shooting. On redirect examination, Thomas stated that she had not seen Barnett since the incident, and she had heard that Barnett moved to California.

Heather Glissen, a police radio dispatcher for the Memphis Police Department, testified that she received a 911 call on January 5, 2008, at 8:37 p.m. from an address of "1851 The Elms Avenue." The caller, who identified himself as Mr. Williams, reported that two males in a red car had been shot in front of the house. Glissen transferred the information to the fire and police departments. They received information that it had possibly been a drive-by shooting and that the responsible party was in a black Ford F-150 truck that "left the scene going southbound on Overton Crossing from the address."

Officer Mark Kloek, uniform patrol with the Memphis Police Department, testified that he was patrolling the Frayser area in a one-man unit on January 5, 2008, and his partner, Officer Alex Cabrera, was in another unit. Officer Kloek stated that he and Officer Cabrera were parked in a parking lot at the corner of Overton Crossing and Frayser Boulevard discussing the day's events when they heard "approximately three gunshots." Shortly after hearing the gunshots, they were dispatched to 1851 The Elms Avenue with information that there had been a shooting and that a red car was trying to leave the scene of the incident.

Officer Kloek testified that when they turned onto the street, they observed a red car "lurching forward and not going too smoothly." When the red car stopped, the officers saw a "very mad and upset and irate" man get out of the passenger's seat of the car and "an individual who obviously was deceased" in the car. The angry man slammed his fist onto the rear glass of the red car and shattered it. The officers detained the angry man in the rear of a patrol car because they were not sure of his role in the shooting. The officers called an ambulance and then maintained the crime scene until investigators arrived. Officer Kloek noted that there was no one standing around outside when he arrived on the scene.

Officer Alex Cabrera with the Memphis Police Department testified consistently with Officer Kloek. He elaborated that about three to four minutes elapsed from the time he heard the gunshots to the time he received the dispatch call, and it took about two minutes to arrive on the scene. Officer Cabrera recalled that when the angry man, whom they learned to be Avery Diggs, got out of the red car, he had on a jacket but took it off and threw it into the street. Officer Cabrera stated that he checked Diggs for weapons prior to putting him in the backseat of the patrol car. Officer Cabrera said that when they first arrived at the scene, they did not see any vehicle other than the red car.

Jeff Hilliard, a firefighter paramedic with the City of Memphis Fire Division, testified that he arrived to the scene at 1851 The Elms Avenue at 8:50 p.m. Hilliard said that the patient in the backseat of the patrol car had a laceration to his right hand and a possible gunshot wound to his left hand. Hilliard stated that the patient's wounds were bandaged, and he was transported to the hospital. The driver of the red car was dead on arrival. Hilliard did not see a weapon on the deceased or inside the vehicle.

Detective Kimberly Woodard-Houston with the Organized Crime Unit of the Memphis Police Department testified that she was working as a patrol officer at the time of the incident and responded to the scene. When she arrived, Detective Woodard-Houston attempted to talk to people at the house concerning what they had seen without much success. She recalled that a man who was barbecuing, identified as the defendant, told her that he did not remember seeing anything, and the other people "just start[ed] one by one going inside the house." Detective Woodard-Houston asked the defendant to accompany her to Officer Kloek's vehicle to give a statement. She conducted a pat-down search of the defendant for officer safety, during which a spent twelve-gauge shotgun shell fell from the leg of his pants.

Sergeant Wyley Taylor with the Memphis Police Department's Felony Response Unit testified that he responded to the scene and was briefed by Detective Woodard-Houston. He was informed that a spent shotgun shell had been found on the defendant's person. Sergeant Taylor turned the spent shell over to a crime scene officer to be tagged into evidence. Sergeant Taylor also spoke with Elisha Dowell, who lived at the residence, and she gave consent to search her house. Sergeant Taylor did not locate any weapons in his search of the house. However, he did discover unfired shotgun shells inside the house.

Officers Joseph Giannini and James Kevin Smith, crime scene officers with the Memphis Police Department, documented the scene by drawing sketches and taking photographs. The officers observed a red Ford Contour with the victim sitting in the driver's seat and noted that there "appear[ed] to be some shotgun wadding . . . laying on the victim's shirt[.]" The vehicle was taken to the crime scene office's facility for further

processing. Among the items collected either at the scene or from the vehicle during processing were a shotgun slug with red fibers that was recovered from the driver's side door molding; a light-weight, dark-colored jacket found across the street from the victim's vehicle; several twelve-gauge shotgun shells found around the scene; and the aforementioned shotgun wadding found on the victim's shirt. No weapons were found inside the victim's car.

Sergeant Eric Freeman, a homicide investigator with the Memphis Police Department, testified that he was the lead investigator on the defendant's case. Sergeant Freeman stated that he arrived at the scene shortly after 10:00 p.m. and observed a red Ford Contour in front of 1869 The Elms Avenue with a young black male in the driver's seat. The man was slumped over with his eyes and mouth open and a "huge gunshot wound to the head." Sergeant Freeman saw blood and "brain matter" all over the car. From his visual inspection of the car, Sergeant Freeman did not see any weapons on the body of the victim. Sergeant Freeman also observed broken glass in front of 1851 The Elms Avenue and that all of the windows were broken out of the car.

Sergeant Freeman testified that he returned to the police station where he spoke with various witnesses, none of whom provided useful information. Meanwhile, other investigators were questioning other witnesses. Sergeant Freeman was unable to interview the defendant that night because he was "pretty intoxicated at that time." Nevertheless, the defendant was taken into custody and placed on a forty-eight-hour hold "[b]ecause [the officers] had already got[ten] a few statements from witnesses that were saying that he was the shooter."

Sergeant Freeman testified that the next morning, he and Sergeant Connie Justice drove to Millington to locate Thomas at the IHOP where she worked as well as a few other locations. However, the officers were unable to find her. Sergeant Freeman delegated to Sergeants Bass and Collins the responsibility of taking Elisha Dowell to the location where she said she threw the shotgun over the bridge, but they could not find the weapon. Afterwards, around 12:30 p.m. on January 6, Sergeants Freeman and Bass interviewed the defendant, who had "sobered up at that time."

Sergeant Freeman testified that the defendant was advised of his Miranda rights prior to the interview, and the defendant waived his rights and agreed to speak with the officers. After the interview, the defendant gave a statement that was transcribed with the aid of a typist. The defendant reviewed the written statement and made no corrections. In his statement, the defendant admitted that he was responsible for the victim's death. The defendant explained the events leading up to the shooting, saying that he was inside the house, drinking, when "Shaun" called and said that someone was following him to the

defendant's house. When they arrived,

> [a]t that point the guy that was following [Shaun] ran to [Shaun's] truck. I guess the girl inside the truck was one of their girlfriends. That was when they started saying they were going to kill everybody. At that point I let out a shot in the air and told them to get away from my house. Both guys went to the car. The passenger dude reached down like he had something and said it's on now. At that point he reached down like he was pulling something out and my first reaction was and I let out a shot at the passenger side window. Then I walked back to the porch and called 911. That's when Shaun told me to give him the gun, he would get rid of it. After that the police showed up.

Sergeant Freeman testified that in his statement, the defendant stated that Shaun and Dowell took the shotgun and disposed of it. The defendant said that he only fired two shots with the twelve-gauge shotgun: one in the air and one at the car. He admitted that no one in the red car fired shots at him. He said that he fired the gun because he "felt threatened" and wanted to "scare them off."

Dr. Lisa Funte, an assistant medical examiner in Shelby County, conducted the autopsy of the victim. Dr. Funte stated that the victim's clothing contained multiple "defects" that corresponded to his wounds. An examination of the contents of the victim's pockets revealed personal items, including a small closed pocketknife. Upon initial examination of the victim's body, Dr. Funte noted multiple shotgun wounds: an injury to the head, injury to the right arm, injury to the chest, and injury to the left shoulder. The victim's clothing contained blood and brain tissue. After completing the autopsy, Dr. Funte determined that there were two shotgun wounds. The head wound traversed right to left at the back of the victim's head, injuring the victim's optic and temporal lobes and the brain stem, causing instantaneous death. The second wound track involved the victim's right arm, chest, and left shoulder. Based on the victim's injuries, Dr. Funte surmised that the victim was shot from a distance of one and a half feet to ten feet. Dr. Funte determined that the cause of death was multiple shotgun wounds. It was Dr. Funte's opinion that the victim's wounds could not have been caused by one bullet.

Special Agent Cervinia Braswell, a firearms examiner with the Tennessee Bureau of Investigation ("TBI"), testified that she examined the shot shells, wadding components, and lead projectile recovered in this case. Agent Braswell determined that the shot shells were Remington twelve-gauge slug load ammunition fired from the same twelve-gauge shotgun. She determined that the lead projectile was within the weight specifications of the type of slug loaded into the Remington shot shell, as were the wadding components of the same type normally loaded into Remington slug shot shells.

Elisha Dowell testified on behalf of the defense. Dowell said that on January 5, 2008, the defendant was her fiancée and they were living together at 1851 The Elms Avenue. On that night, they were hosting a birthday party for one of the defendant's friends, "Cheetah," and she had invited Thomas and Barnett but not the victim or Diggs. Later that evening, the victim and Diggs showed up at her house, arriving soon after the defendant's friend, Shaun, who was driving a silver truck, had arrived. The victim got into a confrontation "with everybody trying to get [Barnett] to get out [of] the truck and leave to go with him." Diggs just stood around, while the victim went "back and forth with [Barnett]" and eventually got into an argument with Barnett's sister, Jessica.

Dowell recalled that the victim kept trying to open the door to Shaun's truck, but Barnett would not get out. Dowell said that she told the victim and Diggs to leave; however, the victim "said that he wasn't going anywhere without [Barnett]." Dowell recalled that the defendant came outside of his house and fired a gun up into the air one time and told everyone to leave. Diggs got back into the victim's car, while the victim remained outside "arguing with everybody and stuff." The victim continued to refuse to leave without Barnett, stating "that somebody will have to kill him first." Eventually, the victim said, "[Y]'all got to do what y'all got to do" and went to his car. The victim closed the door to his car, reached down, and then was shot. Dowell looked up and saw the defendant and Shaun standing close together, and she noted the shot came from their direction.

Dowell testified that everyone scattered after the shot was fired, including Thomas, Jessica, and Barnett. Those who remained were trying to decide what to do with the gun, so Dowell went with Shaun to dispose of it. They drove to a bridge off Watkins Street and threw the gun into the river. Later, Dowell gave consent for a police officer to search her house and showed an officer where she and Shaun had disposed of the gun.

On cross-examination, Dowell admitted that she was still dating the defendant exclusively and had visited him often since his incarceration. Dowell acknowledged that the victim did not touch her, Jessica, or Shaun when he was standing outside of the truck trying to talk to Barnett. She did not hear the victim make any threatening statements to Barnett. Dowell testified that the defendant was mad and drunk when he came out of the house and fired the warning shot. Dowell admitted that she identified the defendant in a photographic array as the person who shot the victim.

On redirect examination, Dowell stated that when she said in her statement that the victim said he was "fixing to get in [his] car and go to [his] trunk," he was threatening everyone. She anticipated that he was going to get a gun or some type of weapon to harm anyone nearby "due to the fact that [Barnett] would not get out of the truck." However, Dowell acknowledged on re-cross examination that the victim never got any kind of

weapon.

After the conclusion of the proof, the jury convicted the defendant of second degree murder and aggravated assault.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that "there was insufficient evidence to establish the culpable mens rea and to rebut his claim of self-defense." When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has

the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). For the purposes of this case, an aggravated assault is committed when a person intentionally or knowingly commits an assault as defined in section 39-13-101 and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). A person commits an assault who intentionally or knowingly causes another to reasonably fear imminent bodily injury. Id. §§ 39-13-101(a)(2); -102(a)(1)(B).[3]

The defendant asserts that there was no proof he acted "knowingly" because his being intoxicated negated the culpable mental state. See Tenn. Code Ann. § 39-11-503(a). He asserts that "[i]t is not difficult to understand how an intoxicated person might believe that shooting the weapon was merely a way of encouraging the victim to leave the premises rather than a knowing attempt to kill the [victim]." There was evidence at trial that the defendant had been drinking for several hours before the shooting and was, at least in the opinion of the defendant's fiancée, intoxicated. In addition, the police waited until the following morning to interview the defendant because of his apparent intoxication. However, there was no proof offered as to how much the defendant had consumed or how his actions were affected by his consumption. The jury received a charge regarding intoxication, and all of this evidence was before the jury. It was clearly within the province of the jury to reject the defendant's claim that he was too intoxicated to knowingly kill the victim or intentionally or knowingly commit the aggravated assault of Avery Diggs.

In the alternative, the defendant argues that he acted in self-defense or in the defense of others. At the time of the offense, the self-defense statute provided:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

---

[3] Although the defendant was convicted of both second degree murder and aggravated assault, his arguments focus primarily on the second degree murder conviction.

-10-

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2008).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

There was evidence at trial concerning the defendant's allegation that he only fired at the victim and Diggs because he felt threatened and wanted to scare them. Dowell, the defendant's fiancée, testified that she thought the victim was going to his vehicle to get a weapon to harm everyone. However, no weapons were found in the victim's car or on his or Diggs' person. In addition, Diggs and Thomas both testified that the victim never threatened anyone. Moreover, Dowell testified that the victim did not touch her, Jessica, or Shaun, and she did not hear the victim threaten Barnett. In light of the contrary evidence, it was within the province of the jury to disbelieve the defendant's claim that the shooting was in self-defense or the defense of others.

The defendant lastly argues that the facts of the case warrant no greater conviction than voluntary manslaughter because the killing was in a state of passion produced by adequate provocation. However, it was a question for the jury, which was properly instructed on the elements of second degree murder and voluntary manslaughter, whether the defendant knowingly committed second degree murder or whether he acted under adequate provocation. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury

determined, as was its province, that the defendant committed second degree murder. In the light most favorable to the State, there was ample evidence for a rational trier of fact to conclude that the defendant knowingly killed the victim.

## II. Sentencing

The defendant also challenges the sentence imposed by the trial court, arguing that the trial court erroneously applied "the deadly weapon enhancement factor to both the aggravated assault and murder second degree convictions" and did not apply any mitigating factors.

The trial court conducted a sentencing hearing at which the State presented proof that the defendant received a five-year sentence for a prior Mississippi conviction for attempted auto theft for which he was on probation at the time the present offenses were committed. The State also presented proof that the defendant had two prior felony convictions in Tennessee for theft of property over $500, and the presentence report showed that he also had a host of misdemeanor convictions, including convictions for theft of property less than $500, domestic violence, and driving related offenses. The defendant gave a statement of allocution in which he stated, "[W]e should [have] handled things a certain way but we didn't" and said that he was sorry the victim's family "lost this individual[, but his] kids also lost a father."

In sentencing the defendant, the court reviewed the nature and characteristics of the offense and observed that the killing in this case was "absolutely unnecessary." The court disagreed with the defendant's assertion that the offense was committed under unusual circumstances and that he was provoked, finding that the defendant "was not in the least provoked . . . [and] there's no proof that he was intoxicated to the extent that it [a]ffected his judgment." The court also reviewed the statistical information provided by the administrative office of the courts and noted that the defendant committed the offenses while on probation from a Mississippi conviction. The court addressed that the defendant had given a statement of allocution but found it to be "less than mitigating, he showed no remorse in his statement." The court also questioned the defendant's potential for rehabilitation, noting that his repeated driving charges, although not serious, "show[ed] he just will do what he wants to do." After reviewing the other enhancement and mitigating factors argued by the parties, the court sentenced the defendant to twenty-one years on the second degree murder conviction and five years on the aggravated assault conviction. The court declined the State's request for consecutive sentencing.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the

determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

The trial court enhanced the defendant's sentences based on his previous history of criminal convictions, Tenn. Code Ann. § 40-35-114(1), which included two felony theft of property convictions, a misdemeanor theft conviction, a misdemeanor domestic assault conviction, and driving-related convictions all in Tennessee, as well as an attempted auto theft felony conviction in Mississippi. The court also enhanced the defendant's sentences based on his failure to comply with the conditions of a sentence involving release in the community, id. § 40-35-114(8); use of a firearm during the commission of the offense, id. § 40-35-114(9); and because the offense was committed when the defendant was released on probation, id. § 40-35-114(13)(C).

With regard to the mitigating factors, the court declined to find that the involvement of alcohol provided any mitigation or that "there was any provocation for him to get involved with a deadly weapon." The court also declined to give any mitigation to the defendant's being a high school graduate and "sporadic employment as a welder . . . because people are expected to get an education and have a job."

The defendant argues that the trial court erroneously enhanced both his second degree murder and aggravated assault sentences based on his use of a deadly weapon, see id. § 40-35-114(9), even though the use of a weapon was inherent in the aggravated assault. Upon review, we conclude that the record indicates the court only applied the enhancement factor to the defendant's second degree murder conviction. Defense counsel previously argued to the court that the use of a deadly weapon could not be applied to the aggravated assault conviction, then in addressing the deadly weapon enhancement factor, the court stated: "I give [this factor] fairly good weight because [the defendant] was in his home, he could ha[ve] stayed in his home and called the police but instead he armed himself and went outside with a loaded weapon *to kill this person*." (emphasis added). In any event, even if the trial court misapplied the deadly weapon enhancement factor to the aggravated assault conviction, the three remaining enhancement factors would have justified a five-year sentence.

The defendant also argues that the trial court should have applied several mitigating factors, in particular: that he acted under the strong provocation of being threatened during a party at his own home by a man he did not know, self-defense grounds excused his conduct, he exhibited remorse, he has acquired a vocational skill, and he has provided meaningful support for his girlfriend and children. We note that the jury rejected the defendant's contentions that he was provoked and acted in self-defense. Moreover, the record shows that the trial court considered the defendant's claims and found that they did not warrant any consideration. Specifically, the court observed that "people are expected to get an education and have a job," and the court found that the defendant was not remorseful in his statement of allocution. The record reflects that the trial court gave due consideration to the sentencing principles and factors; therefore, we uphold the sentence imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE